UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

In re: 21st Century Roofing Systems, Inc.

C.A. NO. 11-12383
Chapter 11

**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS GRANTING AUTHORIZATION OF DEBTOR IN POSSESSION FINANCING**

Debtor in possession, 21st Century Roofing Systems, Inc. ("21st Century") moves this Court, pursuant to §364 of Title 11 of the United States Bankruptcy Code, Rule 401 of the Federal Rules of Bankruptcy Procedure, and Massachusetts Local Bankruptcy Rule 4001-2, to enter an Order in the form attached hereto as Exhibit 1 authorizing 21st Century to incur secured indebtedness upon the terms and conditions set forth in the post petition financing Revolving Line of Credit Loan Agreement ("DIP Loan Agreement") with On the Top, a Massachusetts General Partnership (hereinafter referred to as the "DIP Lender"), attached hereto as Exhibit 2.

In support of the within Motion, 21st Century respectfully states:

**I.    JURISDICTION AND VENUE**

1.    This Court has jurisdiction over this Motion under 28 U.S.C. §157 and §1334. This matter is a core proceeding within the meaning of 28 U.S.C. §157(b) (2). Venue of this proceeding and of this Motion in this district is proper under 28 U.S.C. §1408 and §1409.

**II.    RULE 4001(C)(1)(B) CONCISE STATEMENT**

As of the Petition date, 21st Century had insufficient unencumbered cash or liquid resources with which to finance its operations. In order to ensure that adequate working capital is available to

1

support its reorganization efforts, 21st Century has requested, and the DIP Lender has agreed to fund, a post-petition Revolving Line of Credit Loan upon the terms set forth in the DIP Loan Agreement at Exhibit 2. Given its urgent need for working capital, 21st Century hereby requests the entry of interim and final orders granting it the authority to obtain debtor in possession financing (hereinafter "DIP Financing") under the terms and conditions set forth in the DIP Loan Agreement attached hereto as Exhibit 2, the security agreement ("Security Agreement") attached hereto at Exhibit 3, and the promissory note ("Note") attached hereto at Exhibit 4.

2. Funds obtained under the DIP Loan Agreement, will be used to satisfy 21st Century's general working capital for cost of sale operations and general administrative expenses until the plan of reorganization is approved.

3. The following sets forth the sections of the DIP Loan Agreement and the Interim Order that are required to be identified and highlighted in accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a):

   a. <u>Borrowing limit</u>: revolving line of credit not to exceed Five Hundred Thousand Dollars ($500,000.00). *See Loan Agreement § 13; Order § 4.*

   b. <u>Interest rate</u>: fixed at 6.5% per annum based on a 360 day annualized basis. *See Loan Agreement §§ 13, 4.4.*

   c. <u>Fees</u>: DIP Lender shall charge no fees to 21st Century associated with the DIP Loan. *See Loan Agreement §§ 13, 4.1.*

   d. <u>Maturity</u>: 63 months from reorganization plan approval, or if reorganization plan approval does not take place within 12 months from the date of execution of the Promissory Note, upon 3 months notice. *See Loan Agreement §13.* Payments will be interest only until reorganization plan approval, and upon reorganization plan approval, payments will be made on a 10 year amortization schedule with a balloon payment 63 months from plan approval. *See Loan Agreement §§ 13, 1.1*

   e. <u>Termination</u>: For default only. *See Loan Agreement § 8.1.*

   f. <u>Exact uses to which the funds will be put</u>: See proposed cash flow analysis attached hereto as Exhibit 5.

g. Proposed budget for use of funds: See proposed cash flow analysis attached hereto at Exhibit 5.

h. Adequacy of budget to cover administrative expenses: Yes, see proposed cash flow analysis attached hereto at Exhibit 5.

i. Liens: The Security Agreement at Exhibit 3, grants the DIP Lender a first and prior security interest in and to all of 21st Century's tangible and intangible assets, inventory, accounts receivable, rights to payment and any other property excepting any and all pre-petition account receivables of 21st Century secured pre-petition by Milford National Bank and Trust Company ("Milford National"). *See Loan Agreement § 2.1; Security Agreement § 9; Order § 5.*

j. Events of default: Due to length of conditions please see Loan Agreement at §§ 8.1 and 1.3 at Exhibit 2.

k. Borrowing conditions: Due to length of conditions please see Loan Agreement at § 3.1 at Exhibit 2.

l. Provisions that would remain in effect if interim approval is granted, but final relief is denied: In the event that final relief is denied, the DIP Lender would maintain its security interest in and to the post-petition accounts receivable and other assets and would maintain all of its contractual rights and remedies under the Loan Documents.

m. A grant of priority or a lien on property of the estate: *See paragraph 4(i) above; see also Loan Agreement § 2.1; Security Agreement § 9; Order § 5.*

n. Adequate protection or priority for a claim that arose before the commencement of the case: No adequate protection is required as Milford National will receive its collateral. *See Loan Agreement §3.1(e).*

o. Determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case: The DIP Lender advanced Ninety Eight Thousand ($98,000) Dollars prepetition ("Prepetition Advance"), made up of Thirty Eight Thousand ($38,000) Dollars for attorney fees and Sixty Thousand ($60,000) for critical material purchases and payroll obligations. 21st Century respectfully requests that the Prepetition Advance receive the same treatment as funds to be advanced under the DIP Loan Agreement. *See Order §§ K, 5.*

p. Waiver or modification of the automatic stay: The DIP Loan Agreement contemplates a modification of the automatic stay to the extent necessary to permit the parties to implement the terms of the DIP Loan Agreement, and upon the occurrence of any default to allow the DIP Lender to exercise all rights and

remedies provided in the DIP Loan Agreement and as set forth in the Order. *See Loan Agreement § 8.1; Order § 6.*

q. Waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral, or request authority to obtain credit: During the time that there are amounts outstanding under the DIP Loan Agreement, 21st Century shall not seek to incur debt without the prior written permission of the DIP Lender. *See Loan Agreement § 6(b)(i).*

r. Establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order: Reorganization plan must be approved within 12 months of execution of Promissory Note. *See Loan Agreement §13.*

s. Waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien: The DIP Lender is seeking a super-priority security interest pursuant to the terms of the Loan Agreement and Security Agreement. *See Loan Agreement §§ 2.1, 3.1(e); Order § 5.*

t. Release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action: Upon entry of a Final Order for relief, 21st Century waives the right to challenge Milford National's right to pre-petition accounts receivable. *See Loan Agreement § 3.1(e).*

u. Indemnification of any entity: 21st Century shall indemnify, hold harmless and defend DIP Lender from any liability, claims or losses resulting from the disbursement of the proceeds of the DIP Loan. *See Loan Agreement § 12.2.*

v. Release, waiver, or limitation of any right under § 506(c): None.

w. Liens granted on claims arising under Chapters 5 or 7: None.

x. Pre-payment penalty: None. *See Loan Agreement § 1.4.*

y. Choice of law provision: Laws of the Commonwealth of Massachusetts. *See Loan Agreement § 12.5.*

4. The following sets forth the sections of the DIP Loan Agreement and the Interim Order that are required to be identified in accordance with Local Rule 4001-2(c):

a. Cross collateralization clauses: The DIP Lender seeks to include as a secured debt the $98,000 advance under the Loan Agreement made up of $60,000,000 for

4

<blockquote>

critical material purchases and payroll obligations and $38,000 for professional fees. *See Order §§ K, 5.*

b. <u>Concessions as to the status of pre-petition lien or debt:</u> *See § 4(t) above; Loan Agreement § 3.1(e).*

c. <u>Provisions creating liens on bankruptcy causes of action:</u>  None.

d. <u>Waivers:</u> None.

e. <u>Right to relief from stay:</u>  See § 4(q) above; *See also Loan Agreement § 8.1; Order § 6.*

f. <u>Rollups:</u> None.

g. <u>Non-consensual priming</u>: It is conceivable that the pre-petition lender, Milford National, may contend that its loan is being primed. However, it is the contention of 21st Century and the DIP Lender, that upon the filing of the Petition, that any new receivable created will only be created with the cash borrowed by 21st Century from the DIP Lender. These accounts receivable and all assets derived there from ought to be the security collateral of the DIP Lender and not the pre-petition Lender who ceased lending to 21st Century over one year ago.

h. <u>Disparate carveouts</u>: None. 21st Century is borrowing money from the DIP Lender to pay professional fees, however it is borrowing for the payment of all administrative professional fees and not carving out to the preference of one over another. Furthermore, if the plan is successful the DIP Lender will be purchasing 21st Century and assuming its own loan including that portion used to fund the necessary professional fees for a successful reorganization.

i. <u>Waiver of right to seek use of cash collateral:</u> See § 4(t) above; See also Loan Agreement § 3.1(e).

j. <u>Waiver of procedural requirements for foreclosure</u>: None.

k. <u>Venue in foreign district:</u> None.

l. <u>Payment of secured creditor's expenses</u>: None.

m. <u>Termination default remedies</u>: None.

n. <u>Release of liability:</u>  None.

</blockquote>

III. **<u>STANDARD OF REVIEW</u>**

5. 21st Century proposes to obtain financing under the DIP Loan Agreement by

providing security interests and liens as set forth herein pursuant to §364(c) of the Bankruptcy Code.

6. The statutory requirement for obtaining post petition credit under Section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code] . . . " 11 U.S.C. § 364(c). See *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made reasonable effort to seek other sources of financing under Sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under Section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Sections 364(c) and (d) of the Bankruptcy Code.").

7. Courts have articulated a three-part test to determine whether a debtor is entitled to financing under Section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

   a. the debtor is unable to obtain unsecured credit under Section 364(b), i.e., by allowing a lender only an administrative claim;

   b. the credit transaction is necessary to preserve the assets of the estate; and

   c. the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

See *In re Ames Dep't Stores*, 115 B.R. at 37-39; *see also In re St. Mary Hospital*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *In re Crouse Group*, Inc., 71 B.R. at 549.

## IV. PERTINENT FACTUAL BACKGROUND

8. On March 22, 2011, 21st Century filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. 21st Century continues to operate its business and manage its property as a debtor in possession pursuant to §1107(a) and §1108 of the Bankruptcy Code.

9. No Trustee or Examiner has been appointed in 21st Century's Chapter 11 case, nor have any creditors or other official committees been appointed herein pursuant to §1102 of the Bankruptcy Code.

10. 21st Century is a Massachusetts corporation with its principal place of business located in Foxborough, Massachusetts, and is a construction company specializing in roof repairs and roof construction. 21st Century has been operating since 1988. During construction season, 21st Century operates throughout New England, and has approximately 40 employees.

11. 21st Century's business is cyclical, with most of the work performed in the summer and fall seasons. Generally, 21st Century's business requires an initial outlay of cash, via a loan, to purchase materials with which to perform a roofing job, and as the work proceeds and payments are received, the initial outlay of cash can be repaid.

12. Since 2007, 21st Century's financial condition has been severely impacted by three distinct events. The first was the slowdown of retail building projects, the second was a forced depletion of equity by 21st Century's pre-petition lender, Milford National, and the third was the loss of 21st Century's line of credit.

13. Beginning in late 2007, the global economic meltdown severely affected the whole construction industry, including a slowdown of building related to retail expansion in all markets, including automobiles, clothing and the pharmaceutical industry. This slowdown directly impacted 21st Century, as a severe reduction in building necessarily meant a severe

reduction in the construction of roofs which negatively impacted 21st Century's business. For example, new construction for retail national chain stores in the New England area, where 21st century operates decreased by 62% between September 2007 and March 31, 2010.[1] Prior to this time approximately 50% of 21st Century's roofing business consisted of being a preferred vendor for such National Chain stores as GAP, CVS, Walgreens, Applebee's, Papa Gino's, Stop & Shop and others. Walgreens alone made corporate decisions to reduce their annual new store openings from 500 stores per year in 2006 to 400 in 2007, 300 in 2008 and 250 in 2009. In 2009 it decreased store openings in RI to zero, Connecticut to 6 and Massachusetts only in the Greater Boston area where it opened only 8 a 200% decrease from 2008.

14. As of late 2007, 21st Century's primary lender was Milford National who had provided 21st Century with a line of credit in the initial amount of $500,000.00 (the "Line of Credit"). In or about 2005, the Line of Credit was increased to $750,000.00.

15. In or about 2009, despite 21st Century's timely payments on the Line of Credit, Milford National demanded that 21st Century "pay down" the Line of Credit (the "Pay Down Demand") and froze any future borrowing. *See* Affidavit of Mark Gibson ("Gibson Affidavit") at ¶ 6 attached hereto as Exhibit 6.

16. 21st Century assented to the Pay Down Demand, and used its equity and cash flow to make payments over a period of eight to nine months totaling $125,000.00 to pay down the Line of Credit ("Pay Down Payments"). 21st Century made these payments based on the understanding that upon receipt of the Pay Down Payments, Milford National would cease its aggressive collection actions in light of the fact that 21st Century had made timely payments on the Line of Credit. It further understood and contends that it was led to believe the borrowing freeze would be lifted.

---

[1] CB Richard Ellis 3rd Q. 2010 report on Retail Commercial Construction for New England.

17. 21st Century further informed Milford National that, as a result of the Pay Down Payments, its assets were depleted until the next summer and fall roofing season.

18. In or about the Spring of 2010, despite the Pay Down Payments, and 21st Century's timely payments on the Line of Credit, Milford National again demanded that 21st Century "pay down" the Line of Credit and or immediately pay off the Line of Credit in full.

19. In response to this demand, 21st Century offered to enter into a forbearance agreement with more reasonable terms. Milford National rejected this offer.

20. Further, Milford National then demanded that 21st Century apply to have its loan termed out with a factoring company (the "Factor") with whom Milford National had a "relationship".

21. 21st Century met with the Factor and determined that the annual percentage rate offered by the Factor was approximately 28% to 44% higher than the rate under the terms of the Line of Credit, thus any agreement with the Factor would not allow 21st Century to continue its operations. In addition, the leverage available would not provide adequate borrowing capital. *See* Gibson Affidavit at ¶ 17.

22. Subsequently, in the Summer of 2010, despite the fact that 21st Century had not missed any payments on the line of credit, and despite the Pay Down Payments, Milford National initiated foreclosure proceedings against 21st Century and sought to inhibit 21st Century's ability to collect its outstanding accounts receivable.

23. Despite Milford National's actions, 21st Century has continued to operate through the 2010 building season. It has adapted its business plan to the economic changes and initiated a plan of focusing on older roofs in need of repair, and roofs it installed over the past 25 years still in use and reaching a point of obsolescence. This business plan and marketing strategy is

proving to be effective and 21st Century anticipates for calendar year 2011 it will meet its projection of $8,000,000 in annual sales at a gross profit of 30%, an increase of $3,000,000 from calendar year 2010. Notwithstanding these efforts to re-invent itself during this slow and painful economic recovery, as a result of the economic slowdown, the loss of its line of credit, and the forced depletion of its equity, 21st Century cannot continue to operate any longer without bankruptcy protection. *See* Gibson Affidavit at ¶ 12.

24. That said, despite the recent demise of many of 21st Century's direct competitors in the construction industry, 21st Century has managed to survive some of the most difficult economic times in recent history. Additionally, in 2011, the economy for 21st Century's industry (commercial roofing) appears more optimistic. This appears to be due to an increase in roof retrofit projects, and repairs on existing roofs. 21st Century has received twice the number of bidding opportunities as compared to 2010 at this time. It has booked several projects for the Spring 2011 season, which it hopes to embark upon in April 2011. *See* Gibson Affidavit at ¶ 12.

25. As detailed above, in order to perform work on these potential projects, 21st Century requires cash or credit with which to purchase materials to perform work prior to any payment being received. As such, 21st Century has not been able to locate lenders willing to lend to 21st Century without security. 21st Century has located a DIP Lender who is willing to lend funds to 21st Century as detailed herein. *See* Gibson Affidavit at ¶¶ 7-10. The DIP Lender is engaged in discussions to "take out" the current equity holder, and fund a reorganization plan which would involve an injection of "fresh money" to fund plan payments to unsecured creditors.

26. In sum, if the within Motion is granted, it will allow 21st Century to create new account receivables funded by a new lender with a super-priority over the new receivables,

resulting in the continued operation of 21st Century, partial payment of unsecured creditors, and the preservation of at least 40 jobs in the Commonwealth.

## VI. APPROVAL OF THE DIP FINANCING IS IN THE BEST INTEREST OF 21ST CENTURY'S ESTATE

27. Ample justification exists for the approval of the (a) DIP Financing and (b) the Interim Order.

28. While 21st Century was in the process of negotiating the terms of the DIP Loan Agreement, 21st Century also attempted to identify other sources of post petition financing to determine whether they could obtain debtor in possession financing on better terms. Based on current capital markets conditions, 21st Century determined that post petition financing on an unsecured basis would be unobtainable. *See* Gibson Affidavit at ¶¶ 7-10.

29. There are no holders of liens on any of the property of the estate which are senior or equal to the security to be granted to the DIP Lender.

30. In 21st Century's business judgment, the DIP Loan is reasonable fair and adequate, given the circumstances of 21st Century and the DIP Lender, and will facilitate 21st Century's reorganization. *See In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court"). In support of the same 21st Century respectfully contends that:

    a. The interest rate is competitive with current market commercial rates being offered by Federally Chartered Banks with SBA guarantees (prime plus 2%);

    b. The payment terms are unconventionally flexible. 21st Century can fail to make up to eight consecutive payments with no event of default. *See Loan Agreement § 1.3*. 21st Century respectfully requests that the Court recognize that even conventional lenders do not allow for such terms; and

      c.    The loan term is co-extensive with any five year plan which may be submitted in a reorganization.

31.    Further, 21st Century's need for the DIP Loan is an emergency. As stated above, 21st Century requires funds to purchase building materials prior to commencing a project. Thus, if the DIP Loan is not approved, 21st Century will not be able to obtain materials necessary to perform roofing work[2], which will result in 21st Century being in breach before it even gets an opportunity at reorganization, and make it impossible for 21st Century to obtain new roofing jobs. Without roofing jobs, 21st Century will have no customers, no revenue, and no ability to make payroll. Accordingly, without post petition financing the 21st Century will be unable to operate its business as a going concern, and it will be unable to facilitate its reorganization or maximize the volume of its assets for the benefit of all creditors. Thus, 21st Century has determined, that it requires a post-petition credit facility until successful emergence from Chapter 11. *See* Gibson Affidavit at ¶ 12.

32.    The DIP Lender is willing to make loans and other financial accommodations to 21st Century in order to facilitate the transaction, but only in accordance with the DIP Loan Agreement.

33.    In summation, 21st Century believes that good and sufficient cause has been, and will be shown for the approval of the DIP Loan proposed herein which will not prejudice the interest of any creditor or any party in interest. Approval of the relief requested herein will enable 21st Century to preserve the estate's assets, and realize maximum value for its existing business and assets. Thus, entry of an interim and final order approving the proposed DIP Loan

---

[2] The cash flow analysis at Exhibit 5 is illustrative of this emergency nature. 21st Century is prepared to begin two jobs in April. It is required given its current financial status to pay for the materials in advance. To do so, it will need to draw funds from the DIP Loan. This also supports the need for the DIP Financing as 21st cannot obtain unsecured credit from its primary vendors.

is in the best interest of 21st Century, its creditors and other parties in interest in this Chapter 11 action.

### VII. NOTICE

34. Notice of this Motion has been given to the following: (i) the United States Trustee; (ii) 21st Century's secured lenders; (iii) the DIP Lender or their counsel; (iii) 21st Century's twenty (20) largest unsecured creditors; (iv) all parties in interest who have requested notices in this proceeding; (v) the members of any committee appointed in the case and counsel to any committee.

21st Century submits that in light of the nature of the relief requested herein such notice is appropriate under the circumstances and requests that no further notice be required.

WHERFORE, 21st Century respectfully requests that this Court grant the relief requested herein including entry of the proposed Interim Order attached hereto and schedule a final hearing, and grant 21st Century such other further relief that this Court deem just and proper.

                                          Respectfully submitted,
                                          21st Century Roofing Systems, Inc
                                          By Its Attorney,

                                          /s/ Moshe S. Berman
                                          Vincent Indeglia (Pro Hac Vice Motion Pending)
                                          Moshe S. Berman (BBO #669352)
                                          **Ferrucci Russo P.C.**
                                            55 Pine Street
                                            Fourth Floor
                                            Providence, RI 02903
                                            Tel.: (401) 455-1000
                                            Fax: (401) 455-7778
                                            mberman@frlawri.com
                                            vindeglia@frlawri.com

Dated: March 22, 2011

## CERTIFICATE OF SERVICE

I hereby certify that I have this date electronically filed the Debtor's Motion for Interim and Final Orders Granting Authorization of Debtor in Possession Financing with the Clerk of the Bankruptcy Court for the Eastern District of Massachusetts using the CM-ECF System.

/s/ Moshe S. Berman
Moshe S. Berman  (BBO #669352)
**Ferrucci Russo P.C.**
55 Pine Street
Fourth Floor
Providence, RI 02903
Tel.: (401) 455-1000
Fax: (401) 455-7778
mberman@frlawri.com

Dated:  March 22, 2011